Jason D. Guinasso (Nevada Bar No. 8478)
Devon T. Reese (Nevada Bar No. 7496)
Alex Velto (Nevada Bar No. 14961)
HUTCHISON & STEFFEN, PLLC
5371 Kietzke Lane
Reno, Nevada 89511
Telephone: (775) 853-8746
Facsimile: (775) 201-9611
dreese@hutchlegal.com
avelto@hutchlegal.com
jguinasso@hutchlegal.com

Nina Spizer (*Pro Hac Vice Forthcoming*)
Silvio Trentalange (*Pro Hac Vice Forthcoming*)
DILWORTH PAXSON LLP
1500 Market Street, Ste. 3500E
Philadelphia, PA 19102
Telephone: (215) 575-7000
Facsimile: (215) 575-7200
nspizer@dilworthlaw.com
strentalange@dilworthlaw.com

*Attorneys for Plaintiff Donor Network West*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| DONOR NETWORK WEST, a non-profit corporation, | |
| Plaintiff, | Case Number: |
| vs. | |
| NEVADA DONOR NETWORK, INC, a non-profit corporation, NEVADA DONOR NETWORK FOUNDATION, INC, a non-profit corporation and RENOWN HEALTH, a non-profit corporation, | **VERIFIED CIVIL COMPLAINT** **DEMAND FOR JURY TRIAL** |
| Defendants. | |

     Plaintiff DONOR NETWORK WEST ("DNW"), a California-based non-profit corporation, by and through its undersigned counsel, hereby brings this action against Defendants

NEVADA DONOR NETWORK, INC. and NEVADA DONOR NETWORK FOUNDATION, INC. (collectively referred to herein as "NDN"), and RENOWN HEALTH ("Renown Health"), all of which are Nevada non-profit corporations. DNW is informed and believes, and based thereon alleges, as follows:

**INTRODUCTION**

1.      This case involves Defendants NDN and Renown Health working to prevent Plaintiff DNW from performing its federally mandated organ donation services in DNW's federally designated organ-donation service area in northern Nevada (the "Northern Nevada DSA").

2.      Plaintiff DNW is a non-profit organ procurement organization ("OPO") federally designated and required to serve Reno, NV and the surrounding Northern Nevada DSA. In short, DNW works to recover, preserve, transport, and facilitate the donation of organs for life-saving transplant.

3.      Defendant NDN is an OPO based in Las Vegas, NV and is designated under federal law to serve only hospitals located in the southern Nevada donation service area (the "Southern Nevada DSA").

4.      Recognizing it will never surpass DNW in organ-donation recovery efficiency and competency, Defendant NDN has resorted to unfair tactics to unsettle DNW's relationships in the Northern Nevada DSA with organ donation and recovery stakeholders.

5.      For the last ten years, NDN has taken steps to break into the Northern Nevada DSA and disrupt DNW's ability to recover organs.

6.      In this respect, NDN has made misrepresentations and engaged in misconduct to create confusion and unrest among DNW and affiliated hospital employees, and to disrupt the flow of organ donations throughout the Northern Nevada DSA to needy patients, including Nevadans awaiting life-saving transplant procedures.

7. DNW has served northern Nevada for close to 40 years and has longstanding relationships with area hospitals, medical providers, and the community at-large.

8. DNW accordingly has a longstanding relationship with Defendant Renown Health and has worked closely with its flagship hospital, the Renown Health Regional Medical Center, and with two of its other facilities, Renown South Meadows Medical Center d/b/a Renown Rehabilitation Hospital and Renown South Meadows Medical Center, in the Reno metropolitan area.

9. DNW and Renown Health memorialized this relationship in an Affiliation Agreement.

10. Strangely, despite never complaining of any material shortcomings, quality or competency issues for years, on September 29 and October 23, 2023, Renown Health sent DNW notice it was unilaterally cancelling its federally mandated Affiliation Agreement with DNW without cause, effective January 4, 2024.

11. Upon information and belief, Renown Health breached and noticed termination of the Affiliation Agreement with Plaintiff DNW, only after Defendant NDN offered Renown Health $3 million in seed money for a new organ transplant program, an offer predicated on Renown Health naming NDN its new OPO.

12. Upon information and belief, the $3 million NDN offered Renown Health came through an award NDN obtained via American Rescue Plan Act ("ARPA") funds from the State of Nevada.

13. There is no practical or lawful reason for why NDN demanded its disbursement of federal ARPA funds be predicated on NDN obtaining a federally based organ procurement agreement from Renown Health.

14. Upon information and belief, NDN's offer and demand violated the Anti-Kickback Statute (42 U.S.C. § 1320a-7b), and upends the longstanding federal public policy fostering the

orderly recovery, preservation, and transport of donated organs by specific designated OPOs and other non-profits under federal law and regulations.

15.     In this connection, on September 11, 2023, Renown Health indeed applied for a required waiver from the U.S. Centers for Medicare & Medicaid Services ("CMS") to designate NDN as Renown Health's new OPO.

16.     CMS, however, has not granted nor is expected to grant soon any of Renown Health's requested waivers allowing NDN to be Renown Health's new OPO in the Northern Nevada DSA.

17.     This is a problem because Renown Health is remarkably terminating the Affiliation Agreement with Plaintiff DNW—its federally designated OPO in the Northern Nevada DSA—despite having no legal ability to work with any other OPO for organ donation and recovery services in the Northern Nevada DSA.

18.     Put differently, when Renown Health effectuates termination of the Affiliation Agreement on January 4, 2024 (as it represented to DNW), Renown Health will be refusing to work with its federally designated OPO prior to CMS determining whether DNW can be replaced by NDN.

19.     Renown Health consequently intends to refuse to work with its legally designated OPO to serve its donors and to recover organs to save the lives of others, an untenable situation that will cause both Renown Health and DNW to violate federal law.

20.     Further, should Defendant NDN attempt to recover organs in Renown Health's facilities without a CMS OPO waiver in place, it too will be operating outside of federal law.

21.     Upon information and belief, NDN and Renown Health's brazen misconduct causing this OPO hole in the Northern Nevada DSA could put organ transplant patients at grave risk.

22.     NDN's unlawful inducement of Renown Health improperly interfered with DNW's Affiliation Agreement, and Renown Health breached that Agreement when it unlawfully and unilaterally terminated the Agreement without cause and for an illegal purpose.

23.     These actions have damaged DNW, threaten to damage DNW by rendering impossible its ability to comply with federal law, and threaten the health and well-being of Nevadans on the organ-transplant waiting list by harming the process surrounding the donation and recovery of organs in Northern Nevada.

24.     Plaintiff DNW thus brings this Complaint to protect itself from further harm at the hands of NDN and Renown Health.

25.     DNW accordingly seeks injunctive and monetary relief against Defendants Renown Health and NDN.

## PARTIES

**Plaintiff**

26.     Plaintiff Donor Network West is a non-profit 501(c)(3) organization formed under the laws of California with its registered office address at 12667 Acosta Blvd., Ste. 500, San Ramon, CA 94583.

27.     DNW is also a registered non-profit corporation in Nevada and maintains an office at 5440 Reno Corporate Drive, Reno, NV 89511.

28.     DNW is a designated OPO under federal law committed to helping save and heal lives by supporting donor families and engaging in education and community outreach to advocate organ donation as a fundamental human responsibility.

29.     DNW connects organ, eye, and tissue donors with people in need of life-saving transplant. DNW also provides education to hospital staff and community partners on the organ referral and donation process and offers a strong network of support for the courageous donor families who save lives through the gift of organ donation.

30.     DNW is the federally designated OPO for the Northern Nevada DSA.

31.     In that respect, DNW is legally obligated to serve hospitals and health care providers in the counties of Washoe, Carson City, Douglas, Mineral, Churchill, and Humboldt Counties as the designated OPO. *See* 42 U.S.C. § 273(a)-(b)(1), (3).

32.     The counties of Washoe and Carson City were originally designated to the DSA that DNW serves, but DNW is also responsible to serve the counties of Douglas, Mineral, Churchill and Humboldt Counties as the hospitals in those counties sought, and were granted, waivers from CMS to work with DNW in lieu of remaining with the Southern Nevada DSA. NDN, the Southern Nevada DSA, does not have authorization to recover organ donors in those four counties where the CMS hospital waivers were granted.

33.     DNW is the nation's third largest OPO serving more than 13 million people by connecting organ, eye, and tissue donors to transplant recipients not only in the forty-five counties geographically interconnected throughout Northern Nevada and Northern California, but also on the national transplant wait list.

**Defendants**

34.     Defendant Renown Health is a Nevada non-profit organization with a principal address at 1155 Mill Street N-11, Reno, NV 89502.

35.     Renown Health operates one of Nevada's largest health systems with more than 13,000 health care providers statewide.

36.     Renown Health offers a Level II Trauma Center at Renown Regional Medical Center.

37.     Renown Regional Medical Center is Renown Health's flagship hospital, and is located in Reno, NV.

38.     Renown South Meadows Medical Center d/b/a Renown Rehabilitation Hospital and Renown South Meadows Medical Center are also located in Reno, NV.

39.    These three Renown Health facilities fall within DNW's Northern Nevada DSA, and DNW is currently their designated OPO under federal law.

40.    Defendant Nevada Donor Network, Inc., is a non-profit 501(c)(3) organization formed under the laws of Nevada with a principal address at 2055 E. Sahara Ave., Las Vegas, NV 89104.

41.    NDN is the federally designated OPO for the Southern Nevada DSA and serves donor hospitals specific to that geographic area, except for certain hospitals that work with DNW per the above-noted and explained below CMS OPO waiver.

42.    On information and belief, NDN recovers the vast majority of its organ donations from a single county, Clark County.

43.    Defendant Nevada Donor Network Foundation, Inc., ("NDN Foundation") is a non-profit 501(c)(3) organization formed under the laws of Nevada with a principal address at 2055 E. Sahara Ave., Las Vegas, NV 89104.

44.    Upon information and belief, NDN Foundation is a supporting organization to NDN and focuses on funding and creating a full-scale transplant institute in Nevada.

**JURISDICTION AND VENUE**

45.    This Court has original subject matter jurisdiction over this action and these parties pursuant to 28 U.S.C. § 1331 because, DNW's claims arise under federal law including the Public Health Service Act, 42 U.S.C. §§ 201 *et seq*. (which includes the at-issue National Organ Transplant Act, , *et seq.*) and the Social Security Act of 1935, 42 U.S.C. §§ 1138 *et seq.*, and accompanying regulations at, Breac.

46.    This Court also has original subject matter jurisdiction over this action and these parties pursuant to 28 U.S.C. § 1332, because complete diversity of citizenship exists between the parties in this action and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

47.    This Court has personal jurisdiction over Defendants because Defendants are incorporated and/or have their principal place of business in Nevada, and because Defendants' alleged misconduct that harmed DNW occurred in Nevada.

48.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because Defendants are subject to personal jurisdiction in this district and/or a substantial part of the events or omissions giving rise to this action occurred in this district.

## FACTUAL ALLEGATIONS

### A.    The Applicable Statutory and Regulatory Framework

49.    "In the United States, organ transplants are a public-private affair." *Callahan v. U.S. Dep't of Health and Human Servs.*, 939 F.3d 1251, 1254 (11th Cir. 2019).

50.    Congress established a national organ transplant infrastructure in 1984 by enacting the National Organ Transplant Act of 1984, Pub. L. 98-507, 98 Stat. 2339 (Oct. 19, 1984) (codified as amended at 42 U.S.C. §§ 273 *et seq.*) ("NOTA").

51.    NOTA directs the Secretary of Health and Human Services ("HHS") to register qualified OPOs and to designate only one registered and qualified OPO for each DSA throughout the country. 42 U.S.C. § 273(a)-(b)(1).

52.    Under NOTA, a qualified OPO is required to, among other things, recover, preserve, allocate equitably, transport, and distribute, donated organs from its respective DSA in facilitation of organ transplant procedures. *Id*. at § 273(b)(1), (3).

53.    Toward this end, NOTA requires each OPO to have effective agreements with a substantial majority of the hospitals in its designated DSA that have organ donation facilities and/or programs. *Id*. at § 273(b)(3)(A).

54.    An OPO accordingly develops relationships and protocols with the hospitals operating within its respective designated DSA coverage area. *Id*.

55.    Correspondingly, the Social Security Act of 1935 (the "SSA") requires Medicare

8

and Medicaid participating hospitals that conduct organ recovery or transplants to have an exclusive agreement with the OPO in their DSA. 42 U.S.C. § 1320b-8(a)(1)(C). Regulations further require that, "[u]nless CMS has granted a hospital a waiver . . . the hospital *must* enter into an agreement *only* with the OPO *designated* to serve the area in which the *hospital is located*." 42 CFR § 486.308(a) (emphasis added).

56.     Thus, only one OPO operates in a DSA and a hospital in a DSA may contract with only one OPO—the CMS designated OPO to serve that hospital, absent the existence of a waiver that has been granted to a hospital by CMS. *Id*.

57.     This above-described organ donation federal regulatory regime has been in place for decades, and ensures that the OPO working with an organ donor decedent's family in a DSA is free from profit or competitive motivation, and that its service fees are tied to actual cost.

58.     Although the OPO/DSA framework is based on metropolitan service areas, and not political boundaries, the SSA does permit a hospital to work with an OPO outside its DSA, but only under limited circumstances and upon receiving a waiver from CMS. *Id*. at § 1320b-8(a)(2)(A), (B); *see also* 42 CFR § 486.308(e).

59.     To obtain an OPO waiver, the requesting hospital must demonstrate to CMS that: (i) the waiver is expected to increase organ donation; and (ii) the waiver will assure equitable treatment of patients referred for transplants within the service area served by such hospital's designated organ procurement agency, and within the service area served by the organ procurement agency with which the hospital seeks to enter into an agreement under the waiver. *Id*.

60.     CMS may consider other factors such as cost effectiveness and quality improvements in granting an OPO waiver request. *Id*.

61.     In making an OPO waiver request, the SSA requires the requesting hospital to submit an application to CMS, after which, CMS shall: (i) publish a public notice of any waiver

application received from a hospital within 30 days of receiving such application; and (ii) prior to making a final determination on such application offer interested parties the opportunity to submit written comments to CMS during the 60-day period beginning on the date such notice is published. *Id*.

62.     Thus, the shortest time prescribed for CMS action on an OPO waiver request is 61 days from receipt of a hospital's application. *Id*.

63.     Here, CMS published Renown Hospital's OPO waiver request to designate NDN as its new OPO on November 24, 2023. *See* Medicare and Medicaid Programs; Announcement of Application From a Hospital Requesting Waiver for Organ Procurement Service Area, *available at* https://www.federalregister.gov/documents/2023/11/24/2023-25904/medicare-and-medicaid-programs-announcement-of-application-from-a-hospital-requesting-waiver-for   (Nov. 24, 2023).

64.     The public comment period thus ends on January 23, 2024. *Id*.

65.     Moreover, upon information and belief, CMS has not acted on any U.S. hospital's OPO waiver application since 2014.

66.     Notably, upon information and belief, CMS granted its last OPO waiver application in 2014, waiving in DNW to serve several hospitals in the Southern Nevada DSA (Defendant NDN's designated territory).

**B.     DNW Is Renown Health's Designated OPO in the Northern Nevada DSA**

67.     DNW is the designated qualified OPO for the Northern Nevada DSA under federal law.

68.     This designation is memorialized in an agreement between DNW and CMS. *See* Exhibit 1 (the "CMS Agreement").

69.     DNW has been the sole OPO in the Northern Nevada DSA for over forty years.

70.     CMS and DNW most recently renewed the CMS Agreement on May 9, 2022. *Id*.

71.     The CMS Agreement provides DNW with the exclusive right to conduct organ recovery, preservation, allocation and transportation activities in the Northern Nevada DSA. *Id*.

72.     The CMS Agreement, and the federal regulatory regime described above, requires DNW to contract with any Medicare and Medicaid participating hospital engaged in organ recovery or transplant procedures in its Northern Nevada DSA. *Id*.; *see also* 42 U.S.C. § 1320b-8(a)(1)(C).

73.     The CMS Agreement thus entirely governs organ donation services for Medicare and Medicaid participating entities in the Northern Nevada DSA.

74.     The Northern Nevada DSA includes Defendant Renown Health's flagship hospital, Renown Regional Medical Center, Renown South Meadows Medical Center d/b/a Renown Rehabilitation Hospital, and Renown South Meadows Medical Center, all of which are located in Reno, NV.

75.     On this background, DNW and Renown Health have been parties to an Affiliation Agreement for over forty years. *See* Exhibit 2 (the "Affiliation Agreement").

76.     This Agreement states DNW and Renown Health will work together to recover, preserve, and transport donated organs and tissue for transplantation, or research when transplantation is not possible. *Id*.

77.     In addition to the parties' roles and responsibilities, the Affiliation Agreement also provides:

10.   <u>Termination</u>: This Agreement may be terminated by either party only upon the occurrence of one or more of the following circumstances:

    a.    Decertification by the CMS of Donor Network West as the designated organ procurement organization for Hospital;

    b.    Upon designation of another organ procurement organization by the CMS to be Hospital's designated organ procurement organization;

    c.    Upon the granting of a waiver to Hospital by the CMS to work with another organ procurement organization; or

    d.    Upon a showing by Hospital that it is no longer subject to compliance with any federal or state regulation requiring that it refer potential organ and tissue donors to any organ procurement organization.

    This agreement shall stand as a document without expiration. Either party desiring to terminate this Agreement in response to any of the aforesaid circumstances or without cause shall provide as reasonable notice as is possible, but in no case less than ninety (90) days' written notice to the other party. Such notice shall specifically state the reason for termination of the Agreement, and such party desiring to terminate this Agreement shall provide such documentation to the other party supporting the reason so stated.

*Id.*

78.   To date, none of the relevant conditions precedent in the Affiliation Agreement – Section 10(a)-(d) have occurred.

**C.   Defendants NDN and Renown Health Sabotaged and Disrupted Plaintiff DNW's Organ Donation Operations in the Northern Nevada DSA**

79.   A main purpose of the governing federal organ donation system is to transcend geographic and political boundaries to match donated organs with recipients as quickly as possible.

80.   DNW therefore works with every hospital in its Northern Nevada DSA, as well as with other Nevada-based institutions such as the University of Nevada (Reno School of Public Health), the Nevada Hospital Association, Donate Life Nevada, and other Nevada health and community-based organizations.

81.   DNW also recently established the Northern Nevada Advisory Council, which is comprised of Northern Nevada community leaders and stakeholders in its mission.

82. In the past five years, DNW, which is the third largest OPO in the nation, increased organ donation in the Northern Nevada DSA and surrounding area by 46% from the previous decade.

83. In 2022, DNW had the highest donation rate in Nevada of any OPO operating in Nevada.

84. DNW, accordingly, has invested considerable infrastructure costs and other resources to enhance organ donation accessibility in the Northern Nevada DSA, including but not limited to, an ongoing expansion of highly trained and educated staff in the Northern Nevada DSA and a substantial increase in office space in Reno, NV.

85. Defendant NDN is the federally designated OPO for the Southern Nevada DSA and is headquartered in Las Vegas, NV, about 435 miles from the Northern Nevada DSA, DNW's Reno Office, and Renown Regional Medical Center.

86. More so, DNW's California office, along with the numerous transplant centers that serve Nevada residents, are approximately 217 miles away from Renown Regional Medical Center—i.e., half the distance from NDN's Las Vegas headquarters.

87. Although the above-described federal OPO/DSA organ donation framework intends to curb unnecessary and unfair competition between OPOs, upon information and belief, NDN has worked to infiltrate the Northern Nevada DSA and sabotage and disrupt DNW's relationship with Renown Health and other healthcare systems.

### 1.    NDN's Past Attempts to Infiltrate the Northern Nevada DSA

88. Key to NDN's attempted intrusion into the Northern Nevada DSA includes, upon information and belief, NDN's repeated representation to Renown Health that NDN and/or its affiliated supporting organization, Defendant NDN Foundation, and its project the Nevada Transplant Institute, will fund, build, and then jointly operate with Renown Health an organ transplant center in or around Reno, NV.

89.     Neither NDN nor any OPO in the United States is qualified or permitted to operate a transplant center. Transplant services are hospital functions requiring specific approval from CMS, in accordance with federal law, regulations, and membership in the Organ Procurement Transplantation Network ("OPTN"). Simply put, OPOs recover organs; they do not transplant them.

90.     Upon information and belief, in 2019, NDN's CEO, Joseph Ferreira, represented to Renown Health's then CEO, Dr. Tony Slonim, that NDN would fund a transplant center in the Reno metropolitan area and would work together with Renown Health on both organ donation and transplant operations at the transplant center.

91.     NDN was not then, and is not now, permitted to recover donated organs in the Northern Nevada DSA.

92.     Upon information and belief, NDN was motivated to infiltrate the Reno metropolitan area and DNW's Northern Nevada DSA on the understanding that doing so would increase NDN's margins/revenue by 40%.

93.     Upon information and belief, Chris Bosse, Renown Health's Chief Government Relations Officer *and* a NDN board member, fostered the NDN-Renown Health relationship.

94.     Upon information and belief, Ms. Bosse has served on the NDN board of directors since 2010, despite her employer, Renown Health, not working with NDN due to both the Affiliation Agreement between DNW and Renown Health, and federal law prohibiting NDN from providing organ donation services to Renown Health.

95.     Upon information and belief, Renown Health had great interest in working with NDN on this transplant center project, but the COVID-19 pandemic outbreak in early 2020 interrupted further developments.

//

**2.      NDN Receives $15 Million in ARPA Funding and Plans to Open the Nevada Transplant Institute in DNW's Northern Nevada DSA**

96.      On October 22, 2022, NDN announced it received $15 million in ARPA funds from the State of Nevada, one of the largest amounts awarded to a single non-profit organization by the Interim Finance Committee to date.[1]

97.      These funds were earmarked specifically to support the creation of the Nevada Transplant Institute ("NTI"), which, upon information and belief, intends to collaborate with NDN, academic institutions, hospitals, payers, transplant centers, and community health care providers in a singular, dedicated network to expand transplantation programs and services throughout Nevada.

98.      In May 2023, NDN CEO, Joseph Ferriera, incorporated the NTI and is listed as its President, Secretary, Treasurer, and Director.

99.      On May 11, 2023, it was reported that NDN intends to build the NTI in Reno, NV, within DNW's Northern Nevada DSA.[2]

100.     This is a laudable goal but has nothing to do with an OPO's fundamental function of recovering donated organs, except that without a stable source of organs effectively and lawfully recovered by an authorized OPO, there will be fewer organs to transplant.

---

[1] Press Release, *Amount is one of the largest ARPA allocations awarded to a single nonprofit in the state to date*, Las Vegas Heals (Oct. 22, 2022), *available at* https://www.lasvegasheals.org/nevada-donor-network-awarded-15-million-in-american-rescue-plan-act-funds-from-state-of-nevada-to-establish-nevada-transplant-institute/; *see also* Green and DeSilva, *Nevada Donor Network closer to opening statewide transplant institute*, KNPR (Oct. 31, 2022), *available at* https://knpr.org/show/knprs-state-of-nevada/2022-10-31/nevada-donor-network-closer-to-opening-statewide-transplant-institute.

[2] Bond, *Transplant Center coming to Northern Nevada*, KOLO ABC 8 (May 11, 2023), *available at* https://www.kolotv.com/2023/05/11/transplant-center-coming-northern-nevada/.

101.    To be clear, success of any future transplant services in Nevada does not depend on and is not tied to NDN providing OPO donation services in the Northern Nevada DSA.

102.    If NDN builds the NTI in the Northern Nevada DSA, DNW is still obligated under federal law to serve it as that area's designated OPO.

103.    Further, given DNW's superior donation and recovery rates compared to NDN's, it is safe to say any new transplant program developed in the Northern Nevada DSA will be best served by DNW.

104.    A press release from NDN stated its transplant centers—one in Reno and one in Las Vegas—would be open and operational by October 2023. This representation was wildly optimistic, given that a transplant program must also receive CMS and OPTN approval, neither of which, on information and belief, NDN has applied for. *See* 42 CFR §§ 488.20, 488.61.

### 3.    NDN and Renown Health Re-Engage Transplant Center Discussions and Move to Force DNW Out of the Northern Nevada DSA

105.    Upon information and belief, around December 2022, NDN again approached Renown Health about its participation in operating the NTI to be built in Reno, NV.

106.    Upon information and belief, NDN offered Renown Health $3 million as an inducement to terminate its affiliation with DNW and to engage NDN as its OPO in the Northern Nevada DSA.

107.    Around this time, DNW, in its usual course of business, tried numerous times without success to meet with Renown Health's new CEO, Dr. Brian Erling.

108.    Dr. Erling, however, refused to meet DNW's CEO until the Mayor of Reno intervened to convene a meeting.

109.    On or about May 9, 2023, DNW CEO, Janice Whaley, and others, met with Renown Health CEO, Dr. Brian Erling, and discussed DNW's role as the federally designated OPO in the Northern Nevada DSA.

110.     Upon information and belief, Ms. Whaley and Dr. Erling also discussed NDN's plans to build the NTI in Reno and Renown Health's partnership with NDN in operating the NTI.

111.     Upon information and belief, during this meeting Dr. Erling explained that Renown Health faced financial difficulties and informed DNW of the $3 million forthcoming from NDN in connection with the NTI project.

112.     Upon information and belief, Dr. Erling then asked Ms. Whaley whether DNW could provide Renown Health any resources.

113.     Ms. Whaley responded informing Dr. Erling that DNW could not offer Renown Health any financial funding for an organ transplant center.

114.     Upon information and belief, Dr. Erling responded that Renown Health's decision concerning using NDN or DNW as its OPO depended on Renown Health's best financial interest.

115.     Any promise or payment of money or thing of value made in return for arranging any service for which payment may be made by a federal healthcare program, violates the federal Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(b)).

116.     Further, if any non-profit OPO promised or gave such payment to Renown Health, it would also violate its obligations as a non-profit organization under state law and as a Medicare contractor under federal law.

117.     DNW also believes such promise and/or payment would create a system of exchanging monetary value for the referral of potential organ donors, which is in opposition to public policy prohibiting the exchange of valuable consideration for transplantable human organs.

118.     On or about August 29, 2023, representatives and stakeholders from Reno city government met with Renown Health, NDN, and DNW representatives.

119.     Upon information and belief, during this meeting NDN presented about the NTI project in Reno, NV.

120.    Upon information and belief, during this meeting Renown Health advocated for NDN to become its OPO in the Northern Nevada DSA.

121.    Upon information and belief, during this meeting DNW advised that Renown Health had no legitimate basis to seek an OPO waiver to designate NDN as the new OPO for Renown Health in the Northern Nevada DSA.

122.    Upon information and belief, around the time of this meeting NDN began contacting other hospitals and medical providers in the Northern Nevada DSA suggesting they apply for OPO waivers to work with NDN, considering the supposed impending commencement of the NTI in Reno.

123.    On information and belief, NDN told a Northern Nevada DSA hospital that continuing to work with DNW violated Medicare regulations. NDN's claim is false.

124.    In the above-described meetings and, upon information and belief, in communications and numerous public statements before community members and stakeholders, NDN repeated misrepresentations that: (1) the NTI's transplant program requires that NDN be the sole OPO serving all Nevada hospitals; and (2) that the NTI's transplant program will increase the number of Nevada citizens receiving organ transplants.

125.    NDN's assertions are incorrect because they do not comport with federal law or the corresponding organ, recovery, allocation, and distribution framework.

### 4.    Renown Health Seeks CMS OPO Waiver to Use NDN and Unilaterally Terminates Its Affiliation Agreement with DNW

126.    On or about September 11, 2023, Renown Health applied to CMS for an OPO waiver, seeking to walk away from DNW and use NDN as its new OPO moving forward. *See* Exhibit 3 (Renown Health CMS OPO Waiver Request).

127.    On or about November 24, 2023, CMS opened the 60-day public comment period on Renown Health's OPO waiver application. *See* Medicare and Medicaid Programs;

1   Announcement of Application From a Hospital Requesting Waiver for Organ Procurement

2   Service Area, *available at* https://www.federalregister.gov/documents/2023/11/24/2023-

3   25904/medicare-and-medicaid-programs-announcement-of-application-from-a-hospital-

4   requesting-waiver-for (Nov. 24, 2023).

5          128.    Moreover, on information and belief, CMS last granted an OPO waiver application

6   in 2014, although hospitals around the country have since then submitted waiver applications that

7   CMS published. CMS, nevertheless, has not ruled on any of those applications over the last

8   several years.

9          129.    To date, CMS has not decided Renown Health's OPO waiver application and

10  cannot do so under the regulatory scheme prior to closing the public comment period on January

11  24, 2024. *Id*.

12         130.    Upon information and belief, CMS will then likely take time to consider said

13  public comments, and more time to draft and issue its ruling on Renown Health's OPO waiver

14  application.

15         131.    It is likewise unlikely that CMS will make a determination on Renown Health's

16  OPO waiver request prior to ruling on previously submitted waiver requests from other health

17  care facilities, several of which have been pending for several years.

18         132.    More materially, upon information and belief, Renown Health has no plausible

19  basis to obtain a CMS OPO waiver because any waiver for NDN to serve as its OPO will not

20  increase organ donations or assure equitable treatment of transplant list patients in the Northern

21  Nevada DSA. *See* 42 U.S.C. § 1320b-8(a)(2)(A), (B); *see also* 42 CFR § 486.308(e).

22         133.    Indeed NDN's performance in the recovery of organs for transplant pales in

23  comparison to DNW.

24         134.    The OPTN is a public-private partnership that links all professionals involved in

25  the United States organ donation and transplantation system. The OPTN's public partners include

HHS and the Health Resources and Services Administration. *See* OPTN, About – OPTN, https://optn.transplant.hrsa.gov/about/ (last visited Dec. 7, 2023).

135.    Consistent with its mission, OPTN collects, catalogues, and assesses certain data metrics concerning OPO performance. *See* OPTN, Metrics, https://optn.transplant.hrsa.gov/data/dashboards-metrics/optn-metrics/ (last visited Dec. 7, 2023).

136.    Upon information and belief, Defendant NDN lags behind Plaintiff DNW on every OPTN performance metric for services performed in Nevada.

137.    For the past decade, DNW's Nevada operations have maintained the best OPTN performance and success rating of any Nevada OPO.

138.    For example, DNW's OPTN kidney recovery/discard rate for the past four years was well below the national average and the best of any Nevada OPO.

139.    Upon information and belief, in the kidney donation context, NDN trails expected organ yield national standards, and in 2021 and 2022 NDN had the worst kidney discard rate nationally (discard rate reflects recovered but unused organ donations. OPOs seek to limit discard rates to avoid waste of valuable resources and high costs).

140.    Upon information and belief, DNW procures and provides more transplanted organs per capita than any Nevada OPO.

141.    What is more, DNW's kidney procurement costs are lower than any other Nevada OPO.

142.    Recognizing it would never surpass DNW in efficiency and competency, NDN resorted to unfair and improper tactics and, for the last several years, engaged in misrepresentative misconduct to sabotage DNW's relationships in the Northern Nevada DSA, create confusion and unrest among DNW and affiliated hospital employees, and disrupt the flow of organ donations throughout the Northern Nevada DSA.

143.   Nevertheless, because CMS has not issued a determination on Renown Health's OPO waiver application, DNW remains Renown Health's presently designated Northern Nevada DSA OPO under federal law.

144.   Yet, despite never complaining of any material shortcomings or quality and competency issues by DNW, Renown Health advised DNW in letters sent on September 29 and October 23, 2023, it was unilaterally cancelling its federally mandated Affiliation Agreement with DNW without cause, effective January 4, 2024. *See* Exhibit 4 (9/29/23 Termination Letter), Exhibit 5 (10/23/23 Termination Letter).

145.   In its Sept. 29, 2023 Termination Letter, Renown Health stated, "[t]he reason for the termination is that Renown is partnering with a Nevada-based donor network." Exhibit 4.

146.   Such reason is not a legitimate basis nor an enumerated reason for termination under Affiliation Agreement Section 10. *See* Exhibit 2 (Affiliation Agreement) at Sec. 10.

147.   Renown Health's Termination Letters also failed to satisfy the Affiliation Agreement's notice requirements provided in Section 15. *Id.* at Sec. 15.

148.   Besides violating the Affiliation Agreement, Renown Health is also at odds with governing federal law, because even if Renown Health obtains an OPO waiver, CMS cannot issue such waiver prior to January 24, 2024, considering that the 60-public comment period does not end until January 23, 2024.

149.   Meaning, Renown Health will be operating without a federally designated OPO for at least 20-days, which would impede organ donations, thereby putting organ transplant patients at grave risk.

150.   On October 19, 2023, DNW responded to Renown Health's Sept. 29, 2023 Termination Letter advising, among other things, that Renown Health's unilateral termination violated the Affiliation Agreement, was inconsistent with controlling federal law, and caused

disruption and uncertainty within the organ and tissue donor community. *See* Exhibit 6 (10/19/23 DNW Response Letter).

151.    DNW further asked Renown Health to reconsider and disavow its unilateral Affiliation Agreement termination. *Id*.

152.    Renown Health replied on October 23, 2023, noting it disagreed with DNW's reading of the Affiliation Agreement – Section 10 (Termination) and that its unilateral termination of the contract without cause was justified. Exhibit 5 (10/23/23 Termination Letter).

153.    Renown Health also informed DNW for the first time that it applied for an OPO waiver from CMS on September 11, 2023, and anticipated that CMS would grant the waiver request within 90 days (i.e. no later than December 10, 2023). *Id*.

154.    Although Renown Health noted its disagreement and asserted it could terminate the Affiliation Agreement "without cause," Renown Health attached an email chain to its Oct. 23, 2023 Termination Letter undercutting its position. *See id*. at 8/8/19 Winter Email to Olson; 8/30/19 Olson Email to Whaley.

155.    Renown Health's former CEO, Erik Olson, indeed acknowledged that the Affiliation Agreement's 90-day "without cause" termination notice language, "would likely only apply to the tissue and eyes services, *as CMS designates OPO*." *Id*. (emphasis added).

156.    Notably, tissue and eye recovery services are not governed by the same federal regulatory regime as organ recovery services carried out by designated OPOs.

157.    Renown Health therefore understands it cannot terminate the Affiliation Agreement with DNW without cause for organ recovery services because DNW is Renown Health's CMS designated OPO.

158.    Renown Health's repudiation of the Affiliation Agreement as it applies to DNW's OPO serves in the Northern Nevada DSA without cause is thus improper, because none of the

triggering termination conditions in Affiliation Agreement, Section 10 – Termination have occurred.

159.    Although Renown Health's termination of the Affiliation Agreement effectuates on January 4, 2024, it has already taken noticeable actions negatively impacting DNW's ability to perform its federally mandated OPO organ donation and recovery services.

160.    Renown Health recently cancelled several meetings with DNW about organ recovery, donation, and transplants.

161.    Renown Health's recent uncooperative nature has caused confusion among DNW and Renown Health staff and management involved with organ recovery, donation, and transplant operations.

162.    The confusion caused by Renown Health's sabotage is dangerous as it could result in the loss of a donated organ or organs for transplant. A single organ donor can save as many as eight lives.

163.    All told, DNW understands that Renown Health intends for its unilateral Affiliation Agreement termination to go into effect as of January 4, 2024, even though CMS cannot legally grant the CMS OPO waiver by that date, before the sixty-day public comment period expires.

164.    At such time, Renown Health—the owner and operator of the largest hospital in Northern Nevada—will not be legally connected with any federally designated OPO in the Northern Nevada DSA, thus limiting the supply for the national organ donor list and jeopardizing the smooth provision of donated organs to many Nevadans and others that so desperately need a transplant.

165.    The loss of Renown Health as a participating OPO hospital in the Northern Nevada DSA is timed purposely to cause disruption and harm to not only donors and transplant recipients, but also DNW's standing as the Northern Nevada DSA OPO.

166.    As Defendant NDN well knows, 2024 is the year in which CMS will gauge performance metrics of all OPOs nationally, and comparatively. *See* 85 FR 77898-01 (December 2, 2020 Final Rule).

167.    CMS plans to collect and analyze this OPO performance data to make OPO tier-level determinations in the future, which could mean that a designated OPO can lose its entire DSA if it loses even a single potential donor or transplanted organ.

168.    Indeed, if DNW loses this hunger game scenario due to disruption and confusion sown by NDN, NDN could take DNW and the Northern Nevada DSA over entirely.

169.    In short, NDN's aim in sabotaging DNW at Renown Health and in the Northern Nevada DSA is not to serve Nevadans, but to acquire territory. Rather than collaborate with DNW to accomplish a lifesaving goal, NDN hopes to weaken DNW's strong performance to serve its own territorial goals, even as organ donation processes inevitably suffers.

**5.    NDN Furthers Disruption and Causes Confusion in the Northern Nevada DSA**

170.    NDN has also furthered disruption and caused confusion in the organ donation community in the Northern Nevada DSA.

171.    Upon information and belief, over the past ten years, NDN made public misrepresentations concerning its status as a federally designated OPO in the Northern Nevada DSA, and misled numerous stakeholders and hospitals—including Renown Health—about NDN's ability to provide organ donation services in the Northern Nevada DSA.

172.    More recently, upon information and belief, NDN created confusion by misleading Renown Health and DNW employees via leaked false statements claiming NDN will be Renown's Northern Nevada DSA OPO as of January 1, 2024.

173.    These statements led many to believe Renown Health obtained a CMS OPO waiver to work with NDN when it has not.

174.    Tellingly, Renown Health staff members who were engaged in crucial meetings regarding organ donation quality and protocols queried whether they should even work with DNW on continuous improvement initiatives, given their understanding that DNW would soon no longer be Renown Health's OPO in the Northern Nevada DSA.

175.    Upon information and belief, Renown Health cancelled meetings with DNW on the basis it believed NDN would assume DNW's organ recovery, allocation, transport and donation role and responsibilities as outlined in the Affiliation Agreement.

176.    In this respect, upon information and belief, Renown Health staff members verbally informed DNW employees that they understood DNW's Affiliation Agreement terminated no later than January 2024.

177.    More so, upon information and belief, at an international organ donor conference in October 2023, NDN's CEO falsely represented that NDN is the sole Nevada OPO.

178.    NDN's misrepresentation upset DNW staff present at the conference and caused insecurity.

179.    NDN's misrepresentation also confused the broader organ donation and transplant community present, whose collaboration is essential for the organ donation and transplant system to work effectively and efficiently.

180.    In this way, NDN diminished years of DNW's work establishing trusting relationships with Northern Nevada DSA hospitals—like Renown Health—to foster a fully synchronized organ recovery, donation, and transplant system to serve the maximum transplant recipients.

181.    Additionally in October 2023, NDN held a Job Fair at Atlantis Resort in Reno, NV, and advertised for Reno-based organ-related job openings.

182.    Upon information and belief, NDN posted flyers seeking job applicants at hospitals in DNW's Northern Nevada DSA in full sight of current DNW employees and hospital personnel with whom they work, causing confusion, job insecurity and disruption.

183.    Thus, in addition to interfering with DNW's relationships with Northern Nevada DSA hospitals and stakeholders, NDN interfered with DNW's internal staff and operations.

184.    Upon information and belief, in October 2023, NDN representatives approached DNW employees about applying for NDN jobs serving Renown Health.

185.    Also in October 2023, NDN posted online solicitations seeking organ recovery employees for positions in the Northern Nevada DSA.

186.    Further, upon information and belief, in November 2023, Renown Health instructed its staff to stop collaborating with DNW in providing support for the National Celebration of Organ Donation event held during the Rose Bowl Parade on or about January 1, 2024.

187.    NDN's interference and Renown Health's disengagement from DNW denies Reno-donor families and Renown Health patient/organ recipients the opportunity to participate in a nationwide celebration of their Northern Nevada community and generosity.

6.    **NDN's Caused Disruption and Chaos at Renown Health Violates CMS Guidance Governing Waiver and Transition of OPOs and Harms the Public Interest**

188.    CMS guidance exists concerning the orderly transition of OPOs in a DSA; a framework in place to protect the public interest.

189.    CMS guidance indeed notes that, "[o]utside an approved waiver process, a hospital may not terminate its agreement with its designated OPO," and that a hospital may request to work with an OPO in another DSA, but that a hospital may not terminate its agreement with its designated OPO until a waiver is granted. *See* X-014, Guideline § 482.74(a)(2), CMS State Operations Manual, Appendix X – Guidance to Surveyors: Organ Transplant Programs.

190.    Further, CMS guidance recommends that applicants to become an OPO to a new DSA via waiver must submit a transition plan. *See* 2812.4, CMS State Operations Manual, Publication #100-07.

191.    An incoming OPO to a new DSA must also "submit a monthly summary to the CMS RO to report on its transition activities. The CMS RO will monitor the transition process to ensure successful oversight and management of OPO operations." CMS State Operations 2812.7; *see also* CMS State Operations Manual, Publication #100-07.

192.    CMS issues this guidance to ensure the smooth, safe, and orderly substitution of one OPO for another, especially considering the complex interplay between OPO, hospital, organ donor, and organ transplant recipient.

193.    Defendants NDN and Renown Health continue to disrupt any smooth and orderly transition of OPOs in the Northern Nevada DSA (assuming CMS grants Renown Health's OPO waiver application, which is unlikely).

194.    For example, NDN's recent attempts to poach DNW employees stationed at DNW's Reno office for organ recovery jobs with NDN in Reno has caused insecurity in DNW employees, leaving them unsure whether they will continue to have jobs with DNW after Renown Health's January 4, 2023 Affiliation Agreement termination date.

195.    This uncertainty has also spread to Renown Health employees, who have recently cancelled important organ recovery and donation quality-outcome meetings with DNW employees, under the assumption DNW will no longer be Renown Health's OPO as of early January 2024.

196.    Lack of DNW employee job security and retention, and lack of Renown Health's cooperation and coordination with DNW concerning organ recovery efforts, indeed harms every organ donation/recovery cases and puts organ donation recipients at risk of missing a viable organ donation for transplant.

197.     More so, if CMS denies Renown Health's OPO waiver application, which is likely, the relationships and efficiencies DNW and Renown Health have developed over time are likely to be damaged as a result of turnover and ongoing confusion.

198.     CMS regulations naturally favor orderly OPO transitions at a hospital in event of CMS waiver.

199.     Renown Health's unilateral repudiation and termination of the Affiliation Agreement on January 4, 2024, overrides CMS's guidance proceeds along a reckless timeline.

200.     Renown Health's ongoing refusal to engage collaboratively with DNW on routine matters and NDN's active disruption in the DNW/Renown Health relationship, stand in stark contrast to the highly involved transition preparations necessary to transfer OPO services safely.

201.     The lack of any coordinated or planned exchange of services indicates NDN's intent to undermine DNW by any means necessary, and without consideration of the clear risk the chaos it caused poses to the public.

**7.     NDN Improperly Interfered with the DNW/CMS Agreement**

202.     The CMS Agreement and federal law and regulations mandate DNW serve as the sole Northern Nevada DSA OPO, wherein Renown Health's flagship hospital, Renown Health Regional Medical Center, is located.

203.     NDN, on the other hand, is the designated Southern Nevada DSA OPO.

204.     In this respect, upon information and belief, as the Southern Nevada DSA OPO, NDN fully understands the legal obligations and requirements between an OPO and a hospital in its DSA—that is, absent a CMS OPO waiver, only one OPO in a DSA can serve that hospital.

205.     Despite this knowledge, NDN misled the organ donation community and illegally offered payment to Renown Health to usurp the Renown Health Affiliation Agreement from DNW.

206.    NDN facilitating Renown Health's unilateral Affiliation Agreement termination effectively places DNW in breach of its separate CMS Agreement.

207.    To qualify as an OPO under federal law, DNW requires designation to a defined service area, which in turn requires that all hospitals working with DNW its in service are and are assigned to the OPO and verified by CMS. *See* Exhibit 1 (CMS Agreement); *see also* 42 C.F.R. §§ 486.302, 486.304, 486.306.

208.    Naturally, DNW advised CMS it serves Renown Health.

209.    Renown Health's unlawful termination and breach of the Affiliation Agreement due to NDN's interference thus makes DNW's representation to CMS inconsistent and arguably noncompliant with the CMS Agreement and governing federal regulations.

210.    NDN therefore improperly interfered with DNW's CMS Agreement.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract Against Defendant Renown Health)**

211.    Plaintiff DNW hereby incorporates the preceding allegations as if set forth fully herein.

212.    The Affiliation Agreement between DNW and Renown Health is a valid and binding contract for which each party received adequate consideration.

213.    DNW performed all its obligations under the Affiliation Agreement and Renown Health is not excused from performing its obligations.

214.    Renown Health breached the Affiliation Agreement when it unlawfully, unilaterally terminated the Affiliation Agreement without cause forcing DNW and Renown Health into noncompliance with federal law.

215.    As a direct and proximate result of Renown Health's breach of the Affiliation Agreement, DNW has suffered and will continue to suffer harm and real damages.

216.    Renown Health's breach was knowing, willful and malicious, entitling Plaintiff DNW to exemplary damages.

217.    Further, Renown Health unilaterally terminated the Affiliation Agreement with DNW without having any other service agreement with any other qualified OPO assigned to the Northern Nevada DSA.

218.    Renown Health's conduct violated federal law, including NOTA, the SSA, and accompanying federal regulations. *See* 42 U.S.C. § 273(b)(3)(A); *see also* 42 U.S.C. § 1320b-8(a)(1)(C); 42 CFR § 482.45.

219.    Plaintiff DNW therefore requests this Court declare, pursuant to 28 U.S.C. § 2201, that Defendant Renown Health's unilateral termination of the Affiliation Agreement violates controlling federal law and is therefore void, and that the Affiliation Agreement establishing DNW as Renown Health's exclusive OPO in the Northern Nevada DSA remains in effect, until CMS approves, if ever, Renown Health's OPO waiver application.

**SECOND CLAIM FOR RELIEF**
**(Breach of Implied Covenant of Good Faith and Fair Dealing**
**Against Defendant Renown Health)**

220.    Plaintiff DNW hereby incorporates the preceding allegations as if set forth fully herein.

221.    "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *A.C. Shaw Constr. v. Washoe County*, 105 Nev. 913, 914, 784 P.2d 9 (1989). "The implied covenants of good faith and fair dealing impose a burden that require each party to contract to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." *Shaw v. CitiMortgage, Inc.*, 201 F. Supp. 3d 1222, 1251 (D. Nev. 2016) (internal citation and quotations omitted).

222.    The Affiliation Agreement between DNW and Renown Health is a valid and binding contract for which each party received adequate consideration.

223.    Renown Health breached its duty of good faith and fair dealing when it unlawfully, unilaterally terminated the Affiliation Agreement without cause forcing DNW and Renown Health into noncompliance with federal law.

224.    As a direct and proximate result of Defendant Renown Health's breach of good faith and fair dealing, DNW has suffered and will continue to suffer harm and real damages.

225.    Renown Health's breach was knowing, willful and malicious, entitling Plaintiff DNW to exemplary damages.

## THIRD CLAIM FOR RELIEF
### (Intentional/Tortious Interference with Contractual and/or Prospective Business Relationships Against Defendants NDN and NDN Foundation)

226.    Plaintiff DNW hereby incorporates the preceding allegations as if set forth fully herein.

227.    The Affiliation Agreement between DNW and Renown Health is a valid and binding contract for which each party received adequate consideration.

228.    Upon information and belief, Defendant NDN had knowledge of the Affiliation Agreement between DNW and Renown Health.

229.    Upon information and belief, Defendant NDN committed myriad intentionally wrongful acts intended or designed to disrupt DNW's Affiliation Agreement with Renown Health and its overall working relationship with Renown Health, including but not limited to:

      i.      Repeating false representations to Renown Health that NDN and/or its affiliated supporting organization, Defendant NDN Foundation, will fund, build, and then jointly operate with Renown Health an organ transplant center in or around Reno, NV, with the condition that NDN act as its OPO;

      ii.     Offering Renown Health $3 million to partner with NDN in operating the Nevada Transplant Institute ("NTI") in Reno, NV, provided that Renown allow NDN to serve as its OPO;

      iii.    Falsely announcing before community members and stakeholders that NDN's NTI transplant program requires NDN be the sole OPO

serving Nevada hospitals, and that the NTI's transplant program will increase the number of Nevada citizens receiving organ transplants;

iv.  Misleading Renown Health and DNW employees via leaked false statements claiming NDN will be Renown Health's designated Northern Nevada DSA OPO as of January 1, 2024;

v.  Falsely representing to an international organ donor conference that NDN is the sole Nevada OPO;

vi.  Wrongly soliciting job applicants for positions at Northern Nevada DSA hospitals despite those hospitals not having a CMS OPO waiver to work with NDN in the Northern Nevada DSA; and

vii.  Approaching DNW employees about applying for NDN jobs serving Northern Nevada DSA hospitals despite those hospitals not having a CMS OPO waiver to work with NDN in the Northern Nevada DSA.

230.  NDN had no justification to commit these intentionally wrongful acts.

231.  Upon information and belief, as a result of NDN's intentionally wrongful acts, which included offering funds in exchange for a federal contract, Renown Health breached the provisions contained in the Affiliation Agreement by unlawfully, unilaterally terminating the Agreement without cause.

232.  Prospective contractual relationships exist or existed between DNW and other hospitals in the Northern Nevada DSA.

233.  NDN knew or should have known of the existence of DNW's prospective relationships with the current and/or potential health care providers in DNW's Northern Nevada DSA.

234.  Upon information and belief, NDN has or is pursuing agreements and relationships with other hospitals in DNW's Northern Nevada DSA.

235.  Upon information and belief, Defendant NDN committed intentionally wrongful acts intended or designed to disrupt DNW's agreements with those hospitals, including but not limited to:

i.      Contacting hospitals and medical providers in the Northern Nevada DSA suggesting it would be to their advantage to apply for CMS OPO waivers to work with NDN, in connection with the supposedly impending commencement of the NTI in Reno, NV;

ii.     Wrongly advising a Northern Nevada DSA hospital that its continued work with Plaintiff DNW violated Medicare regulations;

iii.    Falsely announcing before community members and stakeholders that NDN's NTI transplant program requires NDN be the sole OPO serving Nevada hospitals, and that the NTI's transplant program will increase the number of Nevada citizens receiving organ transplants;

iv.     Falsely representing to an international organ donor conference that NDN is the sole Nevada OPO;

v.      Wrongly soliciting job applicants for positions at Northern Nevada DSA hospitals despite those hospitals not having a CMS OPO waiver to work with NDN in the Northern Nevada DSA; and

vi.     Approaching DNW employees about applying for NDN jobs serving Northern Nevada DSA hospitals despite those hospitals not having a CMS OPO waiver to work with NDN in the Northern Nevada DSA.

236.    NDN had no justification to commit these intentionally wrongful acts.

237.    NDN intended to harm DNW by preventing DNW's current and prospective contractual relations with current and/or potential hospitals/health care providers with respect to DNW's OPO services in the Northern Nevada DSA.

238.    Indeed, due to NDN's wrongful interference, NDN caused Renown Health to terminate unilaterally its longstanding Affiliation Agreement with DNW.

239.    More so, due to NDN's wrongful interference and Renown Health terminating the Affiliation Agreement, DNW will be forced to consequently violate its Agreement with CMS concerning its position as the sole Northern Nevada OPO.

240.    Upon information and belief, NDN's interference with DNW's current and prospective contractual relations was and is intentional, willful, malicious, without justification or excuse, and was perpetrated in an effort to obtain an unfair advantage over DNW in the Northern Nevada DSA.

241.    DNW has suffered and will continue to suffer damages, including but not limited to compensatory and consequential damages as a direct and proximate result of NDN's intentional interference with DNW's current and/or prospective contractual relations, in an amount to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Donor Network West, seeks a jury trial on all matters subject to trial by jury and respectfully requests that this Court issue the following relief:

1.    For equitable and injunctive relief declaring:

    a.    That by unilaterally terminating the Affiliation Agreement without cause and without having another organ donation services agreement in place with a qualified OPO certified in the Northern Nevada DSA, Defendant Renown Health violated the National Organ Transplant Act of 1984, the Social Security Act, and accompanying federal regulations, *see* 42 U.S.C. § 273(b)(3)(A); *see also* 42 U.S.C. § 1320b-8(a)(1)(C); 42 CFR § 482.45;

    b.    Defendant Renown Health therefore wrongfully terminated the Affiliation Agreement;

    c.    Defendant Renown Health's wrongful Affiliation Agreement termination is void and it is enjoined from any further unlawful Affiliation Agreement terminations;

    d.    Renown Health wrongfully terminated the Affiliation Agreement by failing to comply with Affiliation Agreement – Section 10 (Termination); and

    e.    Defendant Renown Health is required to engage Plaintiff DNW consistent with the Affiliation Agreement's terms, until and unless

34

1    CMS issues a waiver pursuant to a determination on Renown

2    Health's OPO waiver application.

3    2.    Award compensatory, consequential, exemplary and punitive damages to Plaintiff

4    DNW in an amount in excess of $75,000.00 and to be determined at trial.

5    3.    Award attorneys' fees and costs to Plaintiff DNW.

6    4.    Grant to Plaintiff DNW whatever other relief is just and proper.

7                                **DEMAND FOR JURY TRIAL**

8    Pursuant to Fed. R. Civ. P. 38, Plaintiff DNW demands a trial by jury on all issues so

9    triable.

10    DATED this 8th day of December 2023.

11                                HUTCHISON & STEFFEN, PLLC

12

13                                */s/ Jason D. Guinasso*
                                  Jason D. Guinasso (Nevada Bar No. 8478)
14                                Devon T. Reese (Nevada Bar No. 7496)
                                  Alex Velto (Nevada Bar No. 14961)
15                                5371 Kietzke Lane
                                  Reno, Nevada 89511
16                                Telephone: (775) 853-8746
                                  Facsimile: (775) 201-9611
17                                dreese@hutchlegal.com
                                  avelto@hutchlegal.com
18                                jguinasso@hutchlegal.com

19                                DILWORTH PAXSON LLP
                                  Nina Spizer (*Pro Hac Vice Forthcoming*)
20                                Silvio Trentalange (*Pro Hac Vice Forthcoming*)
                                  1500 Market Street, Ste. 3500E
21                                Philadelphia, PA 19102
                                  Telephone: (215) 575-7000
22                                Facsimile: (215) 575-7200
                                  nspizer@dilworthlaw.com
23                                strentalange@dilworthlaw.com

24                                *Attorneys for Plaintiff Donor Network West*

25

                                        35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CIVIL COMPLAINT VERIFICATION

I, Janice Whaley, declare as follows:

1.      I am the Chief Executive Officer for Donor Network West, the Plaintiff in the present case, and I am authorized to verify this Complaint on its behalf.

2.      I have personal knowledge of the allegations set out in the foregoing Verified Complaint and if called on to testify I would competently testify as to the matters stated therein.

3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint are true and correct to the best of my knowledge. 28 U.S.C. § 1746.

DATED this 7ᵗʰ day of December 2023.

_Janice Whaley_
JANICE WHALEY, CEO Donor Network West

36

**EXHIBITS INDEX**

| Index No. | Document Title | No. of Pages* |
|---|---|---|
| **Exhibit 1** | CMS Agreement | 2 |
| **Exhibit 2** | Affiliation Agreement | 8 |
| **Exhibit 3** | Renown Health CMS OPO Waiver Application dated September 11, 2003 | 4 |
| **Exhibit 4** | Renown Healtth Termination Letter dated September 29, 2023 | 2 |
| **Exhibit 5** | Renown Health Termination Letter dated October 23, 2023 | 17 |
| **Exhibit 6** | Donor Network West Response Letter to Renown Health dated October 19, 2023 | 5 |